OPINION
{¶ 1} This matter is before this court upon the appeal of Pathfinder Service Association, defendant-appellant, from the March 8, 2002 judgment entry of the Franklin County Court of Common Pleas which permanently enjoined appellant from maintaining or operating slot machines and/or "games of chance" including but not limited to the electronic video machines known as "Treasure Quest," "Reel Stevens," "Wildfire Multi-Tab" and "Poker Pull-Tab." Following a hearing held in August 2000, the trial court had determined the above items were "slot machines" and "games of chance." Following a second hearing in August and December of 2001, the trial court concluded that appellant is not an "educational organization" as such is defined in R.C. 2915.01(J) and permanently enjoined appellant from selling instant bingo tickets or operating any scheme or game of chance.
 {¶ 2} Appellant sets forth the following eight assignments of error on appeal:
 {¶ 3} "I. The Franklin County Common Pleas Court erred when it did not dismiss the case pursuant to appellant's motion which alleged that a criminal conviction is a necessary requirement for a finding of nuisance involving gambling.
 {¶ 4} "II. The Franklin County Common Pleas Court erred when it did not dismiss the part of the case unrelated to the slot machine issue because the complaint did not allege facts which constituted a nuisance relating to schemes of chance.
 {¶ 5} "III. The Franklin County Common Pleas Court erred when it found that the electronic video pull tab machines labeled Treasure Quest and Wildfire were slot machines, by incorrectly interpreting R.C.2915.01(C) and (D) and finding that it is the system or manner in which price, chance and prize are delivered to the player separates R.C.2915.01(C) and (D) contra to the Ohio Supreme Court holding in Mills Jennings v. Ohio Department of Liquor Control(1982), 70 Ohio St.2d 95.
 {¶ 6} "IV. The Franklin County Common Pleas Court erred when it found that the electronic video pull tab machines labeled Poker Pull Tabs and Reel Sevens [sic] were slot machines.
 {¶ 7} "V. The Franklin County Common Pleas Court erred because the evidence provided by the state did not prove a violation of Revised Code2915.02 or 2915.03.
 {¶ 8} "VI. The Franklin County Common Pleas Court erred when it found that donations by Pathfinder to organizations which were not educational organizations provided evidence that Pathfinder was not an educational organization.
 {¶ 9} "VII. The Franklin County Common Pleas Court erred when it found that Pathfinder employees are paid to operate schemes of chance at Pathfinder locations.
 {¶ 10} "VIII. The Franklin County Common Pleas Court erred when it found that Pathfinder was not eligible to conduct schemes of chance."
 {¶ 11} The State of Ohio, Ron O'Brien, Prosecuting Attorney, plaintiff-appellee, has filed a cross-appeal, assigning the following assignment of error:
 {¶ 12} "The trial court erred as a matter of law in finding that an organization conducting charitable gambling selling `schemes of chance' pursuant to R.C. 2915.02 may pay rent as a reasonable expense."
 {¶ 13} On August 11, 2000, appellee filed a complaint against appellant seeking to abate nuisances, pursuant to R.C. 2915.03 and R. C. Chapter 3767, alleging that appellant was illegally operating gambling devices at several locations throughout Franklin County. Appellee filed an application for a temporary injunction which was heard before the trial court, pursuant to R.C. 3767.04(B), on August 21 and 22, 2000. The trial court was asked to determine whether the machines in evidence; "Treasure Quest," "Reel Stevens," "Wildfire Multi-Tab" and "Poker Pull-Tab" were "schemes of chance" or "games of chance" and if the games were "slot machines."
 {¶ 14} The court concluded that the machines in question were "games of chance" and that the machines were also "slot machines," which are specifically identified in R.C. 2915.01(D). Having found that the machines in question were "games of chance" as well as "slot machines" as defined in R.C. 2915.01(D), the court concluded that the use or operation of the machines for the purpose of gambling for money, prizes, free play, or any other thing of value is unlawful and constitutes a nuisance and granted appellee a preliminary injunction to abate the nuisance.
 {¶ 15} A hearing for a permanent injunction was tried before the court on several dates in August and December 2001. The testimony presented indicates that, in addition to the video slot machines, appellant sold "schemes of chance" commonly known as "tip tickets" at each of its six lease locations. With regard to appellant's finances, the court noted the following relevant evidence:
 {¶ 16} "* * * Pathfinder bought the Tip Tickets from a number of different distributors, including Say Distributing. Say Distributing was incorporated on February 17, 2000 by Jay Young and Brock Smith, Pathfinder's president and treasurer, as a corporation for profit to engage in the distribution of schemes of chance and games of chance. From March 6, 2000 through August 26, 2000, Pathfinder Services Association paid Say Distributing $198,876.90.
 {¶ 17} "The evidence showed that during the last five months of 1999, Pathfinder Service Association averaged $49,657.16 per month in bank deposits while between January and July 2000, the deposits increased to an average of $184,812.70 per month. For the 12 month period from the time that Young and Smith took over the Pathfinder operation, Pathfinder brought in over 1.5 million dollars in receipts, almost entirely from gambling activities in the form of slot machines and tip tickets. Jay Young and Brock Smith's wages effectively tripled during this one year period.
 {¶ 18} "Pathfinder filed a Form 990 Return of Organization Exempt from Income Tax for the tax year 1999. * * * Dated March 28, 2000, the return includes several places where the entity is required to state `program service accomplishments.' In Part III(a), Pathfinder asserted that it had '(a)dvanced and furthered the educational experience of youth and adults through tutoring and vocational training and other educational experiences (and) (d)istributed funds to other 501(C)(3) charitable non-profit organizations.' Pathfinder went on to claim in that return that during 1999, '(a)n estimated 500 individuals were helped directly through tutoring and training programs.' * * * Despite this claim, there is no evidence that Pathfinder provided tutoring or any other educational experience for youth or adults.
 {¶ 19} "During his investigation and review of various corporate documents, bank accounts and other accounting records for Pathfinder, Attorney General's Investigator Rice was unable to find any indication that Pathfinder conducted any educational activities. Additionally, Rice found no indication that Pathfinder officers were paid to educate anyone.
 {¶ 20} "* * *
 {¶ 21} "Attorney General's investigator Rice found entries indicating that Pathfinder contributed some of the profits from its six gambling operations to certain charitable groups. However, it appears that the amount contributed to all of the groups was less than 30% of Pathfinder's take from its gambling operations. It also appears that a number of those payments were made to organizations that were not `a school, academy, college or university.' "
 {¶ 22} The trial court concluded that appellant did not satisfy the exemption found in R.C. 2915.02(D)(1) because, although appellant had received a determination letter from the Internal Revenue Service ("IRS") indicating that it was exempt from Federal Income Taxation, appellant did not qualify as a charitable organization for purposes of Ohio law. Specifically, the court found that appellant was not an "educational organization" pursuant to R.C. 2915.01(J) and that appellant did not show that it paid all money collected after deduction of only prizes paid out for educational purposes. Although the court found that appellant did contribute some of its profits from gambling to several charitable organizations, the court also determined that those contributions constituted a relatively small percentage of the overall take of appellant's gambling operations and that appellant's donations to other charities and organizations, which were not educational, did not qualify as donations to a school, academy, college or university for purposes of exemption under R.C. 2915.01(J). The court went on to note that the evidence submitted showed that appellant contributed approximately 30 percent of its profits to various charities, the majority of which did not qualify as a school, academy, college or university. Appellee had argued that because appellant paid the salary of employees, including the president and vice-president/treasurer, and rented storefront properties to house the gambling operations, that appellant failed to comply with the requirements for exemption. R.C. 2915.02(D)(1). Specifically, appellee argued that appellant could only be exempt if all of the money or assets received from the scheme of chance after deduction of only prizes paid out during the conduct of the scheme of chance are used by the charitable organization or donated to a charitable organization.
 {¶ 23} The trial court reviewed this court's decision in Robb v. Ohio Dept. of Liquor Control (1994), 95 Ohio App.3d 379. Although the trial court concluded that this court did not determine whether rent was an allowable expense to be deducted from gambling profits, this court found that the term "rent" as used in the factual context of the Robb case where rent was paid out as a percentage of profits received, was not an allowable expense. Based on that language, the trial court concluded that the Robb case does not expressly hold that rent can never be a proper, deductible expense. Instead, the court concluded that a reasonable amount of rent would appear to be a reasonable expense, which could be deducted from gambling profits. Because the evidence presented showed that appellant rented the several storefront locations at a commercially reasonable rate to conduct gambling operations, the court found that appellant could properly pay rent for its gambling booths.
 {¶ 24} Furthermore, the trial court concluded that appellant was paying its employees to actually operate the schemes of chance at its gambling locations, which is expressly prohibited by R.C. 2915.02(D). The trial court also rejected appellant's argument that the state was required to bring criminal charges for violating R.C. 2915.02 prior to bringing an action to abate a nuisance. The trial court disagreed and pointed out an action to abate a nuisance is a civil action and that, although an action to abate a nuisance can be brought after a criminal finding of guilt, such a finding and conviction was not required.
 {¶ 25} The trial court issued a judgment entry March 2, 2002, permanently enjoining appellant from maintaining the nuisance anywhere in Franklin County, Ohio. Further, it was found that appellant was not an "educational organization" as defined in R.C. 2915.01(J) and appellant was permanently enjoined and prohibited from selling instant bingo tickets and operating any scheme of chance or game of chance. Appellant was also ordered to pay a total of $1800 in tax on the nuisances and to pay any and all court costs associated with the action. Thereafter, appellant filed the instant appeal in this court and appellee filed its cross-appeal.
 {¶ 26} The Ohio Supreme Court discussed the history of Ohio's public policy with regard to lotteries and gambling in Mills-Jennings, Inc. v. Dept. of Liquor Control (1982), 70 Ohio St.2d 95:
 {¶ 27} "The first Constitution of Ohio, adopted in 1802, made no direct reference to lottery or gambling. In 1805, the General Assembly passed an Act making various forms of gambling illegal. * * * In 1807, it was made an offense to conduct a lottery `without a special act of the legislature.' 5 Ohio Laws 91. From 1807 to 1828 the General Assembly passed a number of Acts providing for the raising of money, by way of lottery, to make public improvements. In 1830, the General Assembly prohibited the further use of lotteries or schemes of chance for any purpose, 28 Ohio Laws 37, and this prohibition was carried over into the Constitution adopted in 1851. Section 6, Article XV of the Constitution of 1851 provided that `lotteries, and the sale of lottery tickets, for any purpose whatever shall forever be prohibited in this State.' It is interesting to note that when the people of the state adopted the Constitution of 1851, nothing therein was said of gaming or gambling as such, or in the Amendments to that Constitution later adopted. The prohibition of the Constitution was against lotteries and the sale of lottery tickets only. As we have seen, the adverse attitude of the General Assembly toward the use of gambling machines or devices was so pronounced, and their use so adverse to the policy of the state, that it apparently was thought unnecessary to write any prohibition thereof into the Constitution. It was only because the legislatures had seen fit to employ the scheme of a lottery for public and private purposes that the people considered it necessary to prohibit lotteries in the Constitution. This is clearly demonstrated by the enactment of Ohio's first anti-gambling provisions, on February 14, 1807, under the title, `an act, for the prevention of certain immoral practices.' Every '* * * species, kind or way of gambling at hazard or chance, under any pretense whatever, for money or any other article of value, and betting thereon,' were prohibited. 3 Ohio Laws 218. Thus, at the time of the Constitutional Convention of 1851, all gambling, whether games or schemes of chance, was illegal in Ohio.
 {¶ 28} "Relying on the foregoing constitutional provisions, courts in Ohio treated the Constitution as broadly prohibiting lotteries in the generic sense, thus extending the threat of unconstitutionality to other games and schemes of chance. Any device or scheme which served to arouse the gambling instinct was equatable with a lottery for the purposes of applying the public policy expressed in the Constitution. Although the courts seldom relied solely on the Constitution in anti-gambling litigation, it was repeatedly invoked as evidencing a strong public policy against gambling while at the same time the conduct was held to be statutorily proscribed. See Kroger Co. v. Cook (1970), 24 Ohio St.2d 170; Stillmaker v. Dept. of Liquor Control (1969), 18 Ohio St.2d 200; and Westerhaus Co. v. Cincinnati (1956), 165 Ohio St. 327. Thus the general proposition was that just because the Constitution referred only to lotteries, this did not mean that other forms of gambling were allowed.
 {¶ 29} "This entire concept was dramatically changed by the state which, through its own initiative, significantly contributed to the weakening of the clear and long-standing anti-gambling public policy in Ohio. The promulgation of the new Ohio Criminal Code in 1974 (and the 1975, 1976, and 1977 amendments thereto) with regard to R.C. Chapter 2915, the constitutional authorization, effective November 5, 1975, for bingo conducted by a charitable organization for charitable purposes and a lottery operated by the state, added to the already existing pari-mutuel wagering on horse racing, substantially changed the public policy with regard to gambling as it existed when Ohio Adm. Code4301:1-1-53(B) (hereinafter `Reg. 53[B]') was adopted. In addition there is the well-reasoned opinion of Judge Mahoney of the Court of Appeals for Summit County in State ex rel. Gabalac v. Congregation (1977),55 Ohio App.2d 96, to now consider." Mills-Jennings, Inc., supra, at 99-101.
 {¶ 30} In State ex rel. Gabalac v. Congregation (1977),55 Ohio App.2d 96, the issue before the court concerned the constitutionality of R.C. 2915.02(C), which provides: "This section does not prohibit conduct in connection with gambling expressly permitted by law." The county prosecuting attorney had brought an action to enjoin a church from conducting festivals in which poker and blackjack were played contending that the Ohio constitutional prohibition against lotteries also prohibited the games of chance permitted by R.C. 2915.02(C). The court noted as follows:
 {¶ 31} "This assignment is predicated upon an expanding of the definition of the word `lottery' to include all gambling. We cannot adhere to this view. A lottery is a scheme whereby a monetary consideration is paid and the winner of the prize is determined by lot or chance. Stevens v. Cincinnati Times-Star Co. (1905), 72 Ohio St. 112,147. A lottery is a species of gambling. The term `gambling' is broader and encompasses more than the term `lottery.' Westerhaus Co. v. Cincinnati (1956), 165 Ohio St. 327, 339.
 {¶ 32} "Section 6, Article XV, of the Ohio Constitution, reads:
 {¶ 33} "`Lotteries, and the sale of lottery tickets, for any purpose whatever, shall forever be prohibited in this State, except that the General Assembly may authorize an agency of the state to conduct lotteries, to sell rights to participate therein, and to award prizes by chance to participants, provided the entire net proceeds of any such lottery are paid into the general revenue fund of the state and the General Assembly may authorize and regulate the operation of bingo to be conducted by charitable organizations for charitable purposes.' (Emphasis sic.)
 {¶ 34} "The recent amendment of Section 6, Article XV, emphasized above, overcame the prior constitutional inability of the General Assembly to legalize charitable bingo. See, e.g., Columbus v. Barr (1953), 160 Ohio St. 209, 212.
 {¶ 35} "We conclude that Section 6, Article XV, prohibits only one type of gambling — namely, lotteries. Therefore, the legislature can pass laws legalizing other forms of gambling. Those cases cited, holding otherwise, deal only with the power of municipal corporations to legalize gambling in the face of statutory strictures against gambling and were decided on the basis of the paramount police power of the state. Kraus v. Cleveland (1939), 135 Ohio St. 43, 48; State ex rel. Sergi v. Youngstown (1941), 68 Ohio App. 254, 258.
 {¶ 36} "A cogent example of the power of the General Assembly to permit non-lottery type gambling is found in Ohio's Horse Racing Law, R.C. Chapter 3769. See, e.g., State v. Eldred, 32 N. P. (N.S.) 268, 271 (Hamilton County, C. P. 1934).
 {¶ 37} "We hold that the constitution is silent with regard to other forms of gambling. We agree with the trial judge that each type of gambling must be separately analyzed to see if it is a lottery. Those forms of gambling which are not lotteries may be permitted by the General Assembly." State ex rel. Gabalac, supra, at 97-98.
 {¶ 38} Against that historical background, this court must determine whether or not the trial court erred in concluding that appellant was maintaining a nuisance.
 {¶ 39} In the present case, appellees asserted that appellant's operation of its establishments constituted a nuisance pursuant to R.C.2915.01, 2915.02, 2915.03, and R.C. Chapter 3767. As such, we must examine the relevant statutory provisions to determine whether the operation of the businesses constitutes a nuisance.
 {¶ 40} R.C. 3767.01 provides the following relevant definitions:
 {¶ 41} "As used in all sections of the Revised Code relating to nuisances:
 {¶ 42} "(A) `Place' includes any building, erection, or place or any separate part or portion thereof or the ground itself;
 {¶ 43} "(B) `Person' includes any individual, corporation, association, partnership, trustee, lessee, agent, or assignee;
 {¶ 44} "(C) `Nuisance' means any of the following:
 {¶ 45} "(1) That which is defined and declared by statutes to be a nuisance[.]"
 {¶ 46} R.C. 2915.03 provides, in pertinent part, as follows:
 {¶ 47} "(A) No person, being the owner or lessee, or having custody, control, or supervision of premises, shall:
 {¶ 48} "(1) Use or occupy such premises for gambling in violation of section 2915.02 of the Revised Code;
 {¶ 49} "(2) Recklessly permit such premises to be used or occupied for gambling in violation of section 2915.02 of the Revised Code.
 {¶ 50} "* * *
 {¶ 51} "(C) Premises used or occupied in violation of this section constitute a nuisance subject to abatement pursuant to sections 3767.01
to 3767.99 of the Revised Code."
 {¶ 52} R.C. 2915.02(A) provides, in pertinent part, as follows:
 {¶ 53} "No person shall do any of the following:
 {¶ 54} "* * *
 {¶ 55} "(2) Establish, promote, or operate or knowingly engage in conduct that facilitates any scheme or game of chance conducted for profit;
 {¶ 56} "* * *
 {¶ 57} "(5) With purpose to violate division (A)(1), (2), (3), or (4) of this section, acquire, possess, control, or operate any gambling device."
 {¶ 58} "Gambling device" is defined in R.C. 2915.01(F) in relevant part, as follows:
 {¶ 59} "* * *
 {¶ 60} "(2) A ticket, token, or other device representing a chance, share, or interest in a scheme of chance, except a charitable bingo game, or evidencing a bet;
 {¶ 61} "(3) A deck of cards, dice, gaming table, roulette wheel, slot machine, punch board, or other apparatus designed for use in connection with a game of chance;
 {¶ 62} "(4) Any equipment, device, apparatus, or paraphernalia specially designed for gambling purposes."
 {¶ 63} "Scheme of chance" and "game of chance" are defined in R.C.2915.01(C) and (D), as follows:
 {¶ 64} "(C) `Scheme of chance' means a lottery, numbers game, pool, or other scheme in which a participant gives a valuable consideration for a chance to win a prize.
 {¶ 65} "(D) `Game of chance' means poker, craps, roulette, a slot machine, a punch board, or other game in which a player gives anything of value in the hope of gain, the outcome of which is determined largely or wholly by chance."
 {¶ 66} R.C. 2915.01(E) defines a "scheme or game of chance conducted for profit" as follows: "`Scheme or game of chance conducted for profit' means any scheme or game of chance designed to produce income for the person who conducts or operates the scheme or game of chance, but does not include a charitable bingo game."
 {¶ 67} R.C. 2915.02(B) provides, in pertinent part, as follows: "For purposes of division (A)(2) of this section, a person facilitates a scheme or game of chance conducted for profit if the person in any way knowingly aids in the conduct or operation of any such scheme or game, including, without limitation, playing any such scheme or game."
 {¶ 68} R.C. 2915.02(D) provides certain exceptions to the prohibition against gambling as follows:
 {¶ 69} "This section does not apply to any of the following:
 {¶ 70} "(1) Schemes of chance conducted by a charitable organization that is, and has received from the internal revenue service a determination letter that is currently in effect stating that the organization is, exempt from federal income taxation under subsection 501(a) and described in subsection 501(c)(3) of the Internal Revenue Code, provided that all of the money or assets received from the scheme of chance after deduction only of prizes paid out during the conduct of the scheme of chance are used by, or given, donated, or otherwise transferred to, any organization that is described in subsection 509(a)(1), 509(a)(2), or 509(a)(3) of the Internal Revenue Code and is either a governmental unit or an organization that is tax exempt under subsection 501(a) and described in subsection 501(c)(3) of the Internal Revenue Code, and provided that the scheme of chance is not conducted during, or within ten hours of, a bingo game conducted for amusement purposes only pursuant to section 2915.12 of the Revised Code;
 {¶ 71} "(2) Games of chance, if all of the following apply:
 {¶ 72} "(a) The games of chance are not craps for money, roulette for money, or slot machines;
 {¶ 73} "(b) The games of chance are conducted by a charitable organization that is, and has received from the internal revenue service a determination letter that is currently in effect, stating that the organization is, exempt from federal income taxation under subsection 501(a) and described in subsection 501(c)(3) of the Internal Revenue Code;
 {¶ 74} "(c) The games of chance are conducted at festivals of the organization[;]
 {¶ 75} "* * *
 {¶ 76} "(d) All of the money or assets received from the games of chance after deduction only of prizes paid out during the conduct of the games of chance are used by, or given, donated, or otherwise transferred to, any organization that is described in subsection 509(a)(1), 509(a)(2), or 509(a)(3) of the Internal Revenue Code and is either a governmental unit or an organization that is tax exempt under subsection 501(a) and described in subsection 501(c)(3) of the Internal Revenue Code;
 {¶ 77} "(e) The games of chance are not conducted during, or within ten hours of, a bingo game conducted for amusement purposes only pursuant to section 2915.12 of the Revised Code.
 {¶ 78} "No person shall receive any commission, wage, salary, reward, tip, donation, gratuity, or other form of compensation, directly or indirectly, for operating or assisting in the operation of any scheme or game of chance."
 {¶ 79} "Charitable organization" is defined in R.C. 2915.01(H) as follows:
 {¶ 80} "`Charitable organization' means any tax exempt religious, educational, veteran's, fraternal, service, nonprofit medical, volunteer rescue service, volunteer fire fighter's, senior citizen's, youth athletic, amateur athletic, or youth athletic park organization. An organization is tax exempt if the organization is, and has received from the internal revenue service a determination letter that currently is in effect stating that the organization is, exempt from federal income taxation under subsection 501(a) and described in subsection 501(c)(3), 501(c)(4), 501(c)(8), 501(c)(10), or 501(c)(19) of the Internal Revenue Code. To qualify as a charitable organization, an organization, except a volunteer rescue service or volunteer fire fighter's organization, shall have been in continuous existence as such in this state for a period of two years immediately preceding either the making of an application for a bingo license under section 2915.08 of the Revised Code or the conducting of any scheme of chance or game of chance as provided in division (C) of section 2915.02 of the Revised Code."
 {¶ 81} "Educational organization" is defined in R.C. 2915.01(J) as follows:
 {¶ 82} "`Educational organization' means any organization within this state that is not organized for profit, the primary purpose of which is to educate and develop the capabilities of individuals through instruction, and that operates or contributes to the support of a school, academy, college, or university."
 {¶ 83} Pursuant to R.C. 3767.03, "[w]henever a nuisance exists * * * the prosecuting attorney of the county in which the nuisance exists * * * may bring an action in equity in the name of the state, upon the relation of the * * * prosecuting attorney * * * to abate the nuisance and to perpetually enjoin the person maintaining the nuisance from further maintaining it. * * *"
 {¶ 84} R.C. 3767.04 provides that an action for the abatement of a nuisance under R.C. 3767.03 is a civil action, which shall be commenced in the court of common pleas of the county in which the nuisance is located.
 {¶ 85} In a proceeding on a civil complaint for maintaining a nuisance, the trial court is to determine whether, without regard to the knowledge, acquiescence, or participation of the owners, the owners are guilty of maintaining a nuisance as defined in R.C. 3767.02. See State ex rel. Pizza v. Rezcallah (1998), 84 Ohio St.3d 116. In order to obtain an abatement order pursuant to R.C. 3767.02 et seq., or R.C. 3719.10, the plaintiff must establish by clear and convincing evidence that chronic felony violations of R.C. Chapter 2925 occurred on the premises. State ex rel. Freeman v. Pierce (1991), 61 Ohio App.3d 663; State ex rel. Miller v. Anthony (1995), 72 Ohio St.3d 132. Both R.C. 3767.02 and 3719.10 are civil statutes, not criminal statutes. Contrary to appellant's assertion in its first assignment of error, because appellant has not been "accused of an offense," appellant is not entitled to be "proven guilty beyond a reasonable doubt." It is immaterial that the nuisance statute makes reference to certain criminal statutes. Likewise, the fact that R.C.3767.11 provides that, once a nuisance has been established in a criminal action, the prosecuting attorney can bring a civil action to abate the nuisance is likewise immaterial. Clear and convincing evidence is that which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is an intermediate degree of proof, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. State v. Eppinger (2001), 91 Ohio St.3d 158,164.
 {¶ 86} Because the proceeding to abate a nuisance is civil in nature and because a criminal conviction is not necessary prior to the commencement of the action, appellant's first assignment of error alleging that there must be a criminal conviction prior to the commencement of a civil nuisance action is overruled.
 {¶ 87} In the second assignment of error, appellant argues that the trial court erred when it did not dismiss that part of the case which was unrelated to the slot machine issue because the complaint did not specifically allege facts which constituted a nuisance relating to the schemes of chance also being operated by appellant. For the reasons that follow, appellant's second assignment of error is overruled.
 {¶ 88} Civ.R. 8(A) introduced the concept of "notice pleading" which serves "to simplify pleadings to a `short and plain statement of the claim' and to simplify statements of the relief demanded * * * to the end that the adverse party will receive fair notice of the claim and an opportunity to prepare his response thereto." Fancher v. Fancher (1982),8 Ohio App.3d 79, 83.
 {¶ 89} Based upon a review of the complaint, appellant's motions asking the trial court to dismiss and/or grant summary judgment as to those matters being raised beyond the face of the complaint, this court finds that the trial court did not abuse its discretion and did not err in finding that appellant had fair notice of the proceedings against it and opportunity to defend. As such, appellant's second assignment of error is not well-taken and is overruled.
{¶ 90] We begin with appellant's fifth, sixth, seventh, and eighth assignments of error, which are dispositive. The following discussion and case law applies whether the machines at issue are games of chance, as the trial court concluded, or schemes of chance, as appellant contends.
 {¶ 91} In its fifth assignment of error, appellant contends that the trial court erred because the evidence presented did not prove a violation of R.C. 2915.02 or 2915.03. Appellant relies entirely upon the evidence presented at the hearing on the preliminary injunction. At that time, the trial court was asked to issue a temporary injunction with regard to the businesses appellant was operating and machines in question. At that hearing, the state had to demonstrate the likelihood of success at the next level where the court ultimately decided to permanently enjoin appellant from using these machines. At the second hearing, evidence was certainty presented that a profit was made by appellant and its officers. As the trial court noted, the evidence showed that, during the last five months of 1999, appellant averaged almost $50,000 per month in bank deposits. Between January and July of 2000, the deposits increased to an average of nearly $185,000 per month. Furthermore, for the twelve-month period of time that Jay Young and Brock Smith took over appellant's operation, appellant brought in nearly $1.5 million in receipts, almost entirely from gambling activities. Further, tax returns were submitted corroborating this evidence. The trial court concluded that the facts showed by clear and convincing evidence that the primary purpose of appellant's business is to run gambling operations and to make a profit. Appellant's fifth assignment of error is not well-taken and is overruled.
 {¶ 92} In its sixth assignment of error, appellant argues that the trial court erred when it found that donations by appellant to organizations which were not educational organizations provided evidence that appellant was not an educational organization. In its eighth assignment of error, appellant argues that the trial court erred when it found that appellant was not eligible to conduct schemes of chance. For the reasons that follow, both of these assignments of error are overruled.
 {¶ 93} In Cadet-ettes Corp. v. Brown (1977), 62 Ohio App.2d 187, the Court of Appeals for Summit County was presented with the problem of how broadly the word "school" should be construed under R.C. 2915.01(J) for purposes of determining an organization's eligibility, as an educational organization under R.C. 2915.01(H), for a bingo license. Under R.C. 2915.07 and 2915.08, charitable organizations may obtain bingo licenses if they satisfy three definitional requirements set out by R.C.2915.01(H). Similarly, in the present case, a "charitable organization" can, under different circumstances, conduct both "schemes of chance" and "games of chance." In Cadet-ettes Corp., the court looked at R.C.2915.01(H) and 2915.01(J) and concluded that there are three requirements which must be met by an organization seeking to be defined as a "charitable organization" for purposes of R.C. Chapter 2915. First, the organization must be one of the named organizations under R.C. 2915.01(H). As such, the organization must be either a religious, educational, veteran's, fraternal, service, nonprofit medical, volunteer rescue service, volunteer fireman's or senior citizen's organization. Second, the organization must be exempt from federal taxation under subsection 501(c)(3), 501(c)(4), 501(c)(8), 501(c)(10), or 501(c)(19) of the Internal Revenue Code. Third, the organization must have been in continuous existence as such in the state of Ohio for a period of two years preceding the making of the application for a bingo license or, in the present case, the conducting of any scheme of chance or game of chance.
 {¶ 94} There was no dispute in the Cadet-ettes Corp. case that the organization was exempt from federal taxation under the Internal Revenue Code and that it had been continuously in existence as required by the statute. The question came down to what comprised an "educational" organization for purposes of R.C. Chapter 2915, which provides as follows: "`Educational organization' means any organization within this state that is not organized for profit, the primary purpose of which is to educate and develop the capabilities of individuals through instruction, and that operates or contributes to the support of a school, academy, college, or university." R.C. 2915.01(J).
 {¶ 95} The Cadet-ettes Corp. court stated as follows:
 {¶ 96} "In State ex rel. Church of the Nazarene v. Fogo (1948),150 Ohio St. 45, 47, the Supreme Court of Ohio set out the rules for construing the words in statutes and then construed the word `school.' The court stated:
 {¶ 97} "Words of a statute will be construed in their ordinary acceptation and significance and with the meaning commonly attributed to them * * * [Citations omitted].
 {¶ 98} "`In the ordinary acceptation, the term `school,' standing alone, is a place where general education is imparted to young people. The meaning commonly attributed to the term is an institution conducting a course of general education and mental training similar to that offered to children by a public educational system. * * *'
 {¶ 99} "* * * The Supreme Court * * * construed the word `school' in its ordinary acceptation and significance, and with a meaning ordinarily attributed to it. * * *" Id. at 189-190. (Emphasis sic.)
 {¶ 100} The court in Cadet-ettes Corp. concluded that the fact that an organization qualifies as an educational organization under section 501(c)(3) of the Internal Revenue Code does not determine the status of that organization in Ohio. The court found that the Ohio definition is more limited than the federal definition. This court agrees. The fact that appellant is exempt from federal income taxation under the requisite Internal Revenue Code sections and that appellant has been in continuous existence in the state for a period of two years immediately proceeding the conducting of any scheme of chance or game of chance, is not enough, and the trial court correctly found that appellant does not meet the first requirement of being an educational organization as such is defined in the Revised Code.
 {¶ 101} The trial court found that appellant donated approximately 30 percent of its revenue or profits received from its operations. However, not only did the trial court find that 30 percent was entirely too small of an amount to qualify because it did not constitute all of the money or assets received from the games of chance after the deduction only of prizes paid out during the conduct of the games of chance, but also that only a small amount of that money arguably went to any organizations that would qualify under the definition of educational. The definition of a charitable organization in Ohio is more limited than the federal definition. As such, this court finds that appellant was required to show that it was one of the various types of charities enumerated under R.C. 2915.01(H), that it was exempt from federal income taxation and that it had been in existence for a period of two years. The trial court did not err in finding that appellant failed to meet the first criteria. Because these criteria apply to both games of chance and schemes of chance, the trial court was correct in finding that appellant was not eligible to conduct any of its games. Appellant's sixth and eighth assignments of error are not well-taken and are overruled. Further, because this finding disposes of appellant's third, fourth, and fifth assignments of error, those assignments of error are rendered moot.
 {¶ 102} In its seventh assignment of error, appellant argues the trial court erred when it found that appellant's employees are paid to operate schemes of chance.
 {¶ 103} R.C. 2915.02(D)(2)(e) provides, in pertinent part, as follows: "No person shall receive any commission, wage, salary, reward, tip, donation, gratuity, or other form of compensation, directly or indirectly, for operating or assisting in the operation of any scheme or game of chance."
 {¶ 104} The evidence presented at the trial court indicates that Jay Young and Brock Smith, the president and treasurer of appellant, were paid certain sums of money for performing some duties. The state was not able to present evidence regarding what Young and Smith were paid to do. However, the record does indicate that Young and Smith incorporated a company called Say Distributing, a corporation for profit, which engaged in the distribution of schemes of chance and games of chance. From March 6, through August 26, 2000, appellant paid Say Distributing approximately $199,000.
 {¶ 105} Other evidence presented to the trial court indicates that appellant paid wages to several other individuals whose names are identified on Exhibit 10 entitled Employer's Reported Wages — Supplemental. At trial, the state was not able to present evidence indicating what services these various individuals provided to appellant for which they were being paid.
 {¶ 106} In Freedom Rd. Found. v. Ohio Dept. of Liquor Control (1997), 80 Ohio St.3d 202, the Ohio Supreme Court found that in the context of R.C. 2915.02, the words "conduct" and "operate" had different meanings. Specifically, the court looked at R.C. 2915.01(T) where the word "conduct" is defined as follows: " `Conduct' means to back, promote, organize, manage, carry on, or prepare for the operation of a scheme or game of chance but does not include any act performed by a bingo game operator." The court concluded that, because the verbs above are listed in the disjunctive, a charitable organization conducts the scheme or game of chance when it executes any of the actions listed.
 {¶ 107} The court then looked at the word "operate" and noted as follows:
 {¶ 108} "`Operate,' while not expressly defined in R.C. Chapter 2915, connotes performance of an activity, while the verbs used to define `conduct' would allow a charitable organization to delegate operation of the activity, while retaining a supervisory or organizational role. See, e.g., Webster's Third New International Dictionary (1986) 1580-1581 (defining `operate'); see, also, R.C. 2915.01(U) (defining a `bingo game operator' as one who carries out any of the bingo gaming functions). * * *"
 {¶ 109} Based upon the above definitions, the state did not meet its burden of establishing that anyone was paid to operate these schemes of chance and games of chance being conducted by appellant. There was evidence that Renee Wallace was paid for her work as a "booth manager;" however, no evidence was presented to explain what services a "booth manager" renders. Likewise, the evidence clearly reflects that Young and Smith were in a position to benefit financially from the operation of this business; however, the state did not present clear and convincing evidence that they were paid to "operate" the business. As such, appellant's seventh assignment of error is sustained.
 {¶ 110} Appellee has raised one cross-assignment of error arguing that the trial court erred as a matter of law in finding that, appellant who was conducting charitable gambling by selling "schemes of chance" pursuant to R.C. 2915.02, may pay rent as a reasonable expense.
 {¶ 111} In Robb, supra, this court specifically declined to answer the question of whether or not "rent" was an expense, which would be permitted under the statute.
 {¶ 112} Again, we do not reach this issue and we decline giving an advisory opinion. State ex rel. Baldzicki v. Cuyahoga Cty. Bd. of Elections (2000), 90 Ohio St.3d 238. As such, appellee's sole cross-assignment of error is overruled.
 {¶ 113} Based on the foregoing, appellant's first, second, sixth, and eighth assignments of error are overruled, appellant's third, fourth, and fifth assignments of error are rendered moot, appellant's seventh assignment of error is sustained, and appellee's cross-assignment of error is overruled. The judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part.
Judgment affirmed in part and reversed in part.
PETREE, P.J., and DESHLER, J., concur.